IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2019 Session

**STATE OF TENNESSEE v. LUIS A. MEZA OLIVERA**

**Appeal from the Criminal Court for Washington County**
**No. 41243     Lisa Rice, Judge**

**No. E2017-01871-CCA-R3-CD**

The Defendant, Luis A. Meza Olivera, was convicted by a jury of two counts of aggravated assault, a Class C felony; and three counts of aggravated kidnapping, a Class B felony. See Tenn. Code Ann. §§ 39-13-102, -304. The trial court merged the convictions into one count of aggravated assault and one count of aggravated kidnapping. The trial court then imposed a total effective sentence of twelve years. On appeal, the Defendant contends that (1) the evidence was insufficient to sustain his convictions; (2) the trial court erred in admitting evidence of three prior incidents of domestic violence involving the Defendant and the victim; (3) the trial court erred in allowing a child witness to testify by closed circuit television; (4) the trial court erred in excluding a video recording taken after the offenses were committed; (5) the trial court abused its discretion by imposing the maximum sentence for each conviction; and (6) a new trial is warranted due to cumulative error.[1] Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Lawrence Scott Shults, Johnson City, Tennessee (on appeal); Donna M. Bolton, Johnson City, Tennessee (at Rule 404(b) hearing); and Jeffery C. Kelly, District Public Defender, and William Carter Donaldson, Assistant District Public Defender (at trial), for the appellant, Luis A. Meza Olivera.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Anthony Wade Clark, District Attorney General; and Erin D.

---

[1] For clarity, we have reordered and renumbered the issues from how they appear in the Defendant's brief.

McArdle and Justin Bradford Irick, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

On the afternoon of December 27, 2015, deputies from the Washington County Sheriff's Office found the victim, Sherri Swartz, locked in her bedroom, "hogtied," and with a rope tied around her neck. The deputies were dispatched to the victim's home after her five-year-old son, J.S., called 911 and stated that he was locked in the victim's bedroom closet.[2] The victim had no memory of what had happened. Nonetheless, the Defendant was quickly identified as a suspect and arrested in Memphis on December 30, 2015.

**I. Tennessee Rule of Evidence 404(b) Hearing**

The State filed a pretrial "Notice of Intent to Use Prior Bad Acts." The State sought to admit evidence of five prior instances of domestic violence involving the Defendant and the victim under Tennessee Rule of Evidence 404(b). The State argued that the instances of domestic violence were "relevant to prove motive[, ]intent to harm[,] and lack of mistake." The trial court then held an evidentiary hearing on the State's request.[3]

The victim testified that she met the Defendant while she was living in California. The victim described their relationship as "rocky" and stated that the Defendant "had a temper and a drinking issue." The victim explained that "there were . . . times [when the Defendant] would get a little pushy, shovey, [and] things like that." In 2009, the victim became pregnant with J.S. After finding out that she was pregnant, the victim and the Defendant got married.

The victim testified that, while she was pregnant, the Defendant pushed her "down [on to] the corner of the bed" and that she went to the emergency room because she started bleeding vaginally. The victim told the staff at the emergency room that she had fallen and did not report the Defendant. The victim testified that another incident occurred while she was pregnant. The victim explained that the Defendant hit her. Later that day, the victim went to a scheduled doctor's appointment with a black eye. The victim's doctor contacted the police, but the victim told them that it was an accident.

---

[2] It is the policy of this court to refer to juveniles by their initials.

[3] At the time of the evidentiary hearing, the Defendant was represented by a different attorney than the one who would later represent him at trial.

-2-

J.S. was born in 2010. The victim testified that in May 2010, the Defendant went into a "rage" when he could not find something in their bedroom. The Defendant began hitting the victim on her head and back with a remote control. The victim testified that she was holding J.S. while the Defendant hit her and that she attempted to shield J.S. from the Defendant's blows. Later in the day, the victim went to a scheduled doctor's appointment. The victim's doctor called the police, and she reported what the Defendant had done. The State introduced photographs of the victim's black eyes, other bruises, and red marks on her back and arm. The Defendant eventually pled guilty to "disturbing the peace," and the State introduced documentation of his conviction.

Another incident occurred in November 2010. The victim testified that the Defendant took a laptop from her and "slide it across the floor." When the victim went to pick it up, the Defendant started yelling at the victim and pushing her. The victim and the Defendant "kind of [got] in a tussle" over J.S. The victim took J.S. to her car. The Defendant tried to prevent the victim from getting in her car, tried to take J.S. from her, and shut the car door on the victim. The victim eventually was able to drive away and reported the incident to the police. The State introduced photographs of bruises on the victim's face and arm, scratches to her arm, and a busted lip. The victim testified that J.S. suffered a bruise to his eye. The Defendant later pled guilty to "domestic violence," and the State introduced documentation of his conviction.

The final incident occurred in March 2011. The victim testified that she and J.S. had moved to Washington County. The Defendant had driven the victim and J.S. from California and was staying with them for a few days before driving back. The victim testified that they were staying at a "farmhouse" owned by her family. The victim and the Defendant were cleaning out the farmhouse. The victim and the Defendant started arguing after the Defendant began burning trash too close to the house. The victim testified that the Defendant was "very agitated" and that "it was getting really, really tense."

The victim testified that she went to the bathroom to get away from the Defendant. After a few minutes, the victim smelled smoke. The victim was unable to open the bathroom door. The victim was eventually able to call her mother who called 911. When firefighters arrived at the farmhouse, they found a rug on fire in front of the bathroom door and the head of an axe wedged underneath the bathroom door to prevent it from opening. The Defendant later pled guilty to assault and attempted arson. The State introduced photographs of the rug and axe along with documentation of the Defendant's convictions. The victim testified that she and the Defendant divorced after this incident.

Sergeant John Light of the Washington County Sheriff's Office testified that he responded to the incident in March 2011. Sergeant Light recalled that the farmhouse smelled of gasoline and that the victim was "panicking." Sergeant Light corroborated the

victim's testimony that the firefighters found a rug burning in front of the bathroom door and an axe head wedged underneath the door that prevented it from opening.

The trial court issued a lengthy written order addressing the State's request. The trial court found that the first two incidents that occurred when the victim was pregnant had not been established by clear and convincing evidence. However, the trial court found that the May 2010, the November 2010, and the March 2011 incidents had been established by clear and convincing evidence. The trial court also found that "identity, motive, common scheme or plan[,] and intent [were] material issues present in this case." The trial court further found that the three prior incidents of domestic violence were "probative of the [D]efendant's hostility toward the victim, malice, or a settled purpose to harm her." Specifically, the trial court stated that the evidence was "highly probative of the settled intent of the Defendant to harm the victim." The trial court concluded that the probative value of the evidence outweighed the danger of unfair prejudice.

## II. Admissibility of Video Recording Hearing

On August 3, 2016, the State filed a "Demand for Notice of Alibi." On September 22, 2016, the trial court issued a written order giving the Defendant until October 6, 2016, to provide a notice of alibi if he intended to raise an alibi defense at trial. No notice of alibi was filed.

On November 9, 2016, one week before the Defendant's trial was originally scheduled to begin, the trial court granted the Defendant's motion to allow his original counsel to withdraw. The Public Defender's Office was appointed to represent the Defendant. Defense counsel filed a motion to be relieved of the notice of alibi requirement on February 8, 2017. The trial court held a hearing on the motion on February 13, 2017.

At the hearing, defense counsel stated that he wanted to explore if an alibi defense was possible. Defense counsel mentioned that the investigator for the Defendant's original counsel had "a video where [the Defendant] [was] in a department store at a particular time," but that he had not seen the video recording. The prosecutor responded that original counsel had told her about the video recording, that she had asked original counsel to provide her with it, and that original counsel had never provided her with it. The trial court ruled that the video recording would not be admissible at trial because "it should have been turned over to the [S]tate if it was going to be used a long time ago."

## III. Witness Testimony by Closed Circuit Television Hearing

Shortly before trial, the State filed a motion to allow J.S. to testify by closed circuit television as allowed under Tennessee Code Annotated section 24-7-120. The

State argued that J.S. would be traumatized by being in the presence of the Defendant to such an extent that he would not be able to reasonably communicate. The trial court then held an evidentiary hearing on the State's motion.

Paula Holloway testified that she was a therapist at the Children's Advocacy Center and that she had treated J.S. Ms. Holloway estimated that she had seen J.S. fifteen times during his treatment. Ms. Holloway testified that J.S. did not "have the social skills or interaction that [one] would typically see in a child his age," that he had trouble with "emotional regulation," and that he was "very hypersensitive to noises." Ms. Holloway continued, stating that J.S. had "some ticks and repetitive movements that [he would] do, and the more anxious he [became], the more pronounced those" would be. Ms. Holloway testified that J.S. had no siblings, that he lived alone with his mother and grandmother, and that he was home-schooled.

At their first session, Ms. Holloway asked J.S. to describe what had happened. Ms. Holloway recalled that J.S. was "very kind of shut down, very timid, [and] very quiet as he talked about the incidents that happened." J.S. later told Ms. Holloway that "he could hear the noises" as the Defendant attacked the victim and that "it was very scary for him." J.S. continued "to struggle with fear and anxiety" because of the attack. J.S. also "really struggled with separation even to be able to go into the bathroom and brush his teeth at night or [to] be able to sleep independently." Ms. Holloway explained that J.S. was afraid that the Defendant would "come and take him away" or hurt the victim.

Ms. Holloway testified that J.S. would withdraw when she tried to talk to him about the incident. Ms. Holloway explained as follows:

> [Y]ou can physically watch [J.S.], he'll pull down into a fetal position and he'll hide his face. He can't talk about things. Typically, he has to have something in front of him or he has to be physically moving to be able to verbalize any of this. So he either gets very, very hyper kinetic and running around and trying to touch everything or he'll hide on the couch and put his head down and cover his head with the pillow, or he'll actually physically have to hold my hands to be able to talk about the stressful things.

Ms. Holloway testified that she talked to J.S. about the possibility of his testifying in court and that J.S. "really struggled." Ms. Holloway explained that J.S. "was very scared, very withdrawn," and was afraid that the Defendant would "get out of jail and be able to come." J.S. had not seen the Defendant since his arrest. Ms. Holloway did not "specifically" tell J.S. that the Defendant would be in the courtroom when he testified, but J.S. had told her "on more than one occasion" that he did not "want to see" the Defendant. J.S. told Ms. Holloway that he wanted the Defendant "to stay in jail so that . . . [he could] be safe."

When Ms. Holloway was asked how J.S. would react to having to testify in the courtroom with the Defendant, she opined as follows:

Drawing from watching [J.S.] and just discussing coming face to face with . . . [the Defendant], I think [it] would be very distressing for him. I think he's very afraid of seeing . . . [the Defendant], afraid of what the outcome of that would be and just in talking about it, he really struggles to be able to feel safe and to be able to manage his anxiety.

Ms. Holloway concluded that J.S. "would probably become very, very anxious and shut down" if he were forced to testify in front of the Defendant.

The victim testified that since the attack, J.S. had trouble eating, was bothered by loud sounds, and said he was afraid of the Defendant's getting out of jail and "com[ing] to get him." J.S. told the victim that he did not want to testify at trial because he did not want to see the Defendant and was afraid that the Defendant would take him. The victim believed that J.S. would be terrified of seeing the Defendant. The victim worried that J.S. would not be able to testify in front of the Defendant or that J.S. would "say anything" to keep from angering the Defendant.

The trial court granted the State's motion to allow J.S. to testify by closed circuit television. The trial court accredited Ms. Holloway's testimony that J.S. would "shut down" when scared or anxious and that J.S. "still exhibit[ed] fear and anxiety" of the Defendant. The trial court also accredited the victim's testimony that J.S. was afraid to testify. The trial court found that J.S. was "traumatized and would be traumatized in a courtroom setting" with the Defendant present. The trial court further found that the emotional distress to J.S. would be "substantial" and that J.S. "would likely not be able to testify" with the Defendant in the courtroom.

## IV. Trial

At 5:39 p.m. on December 27, 2015, J.S. called 911. J.S. was five years old. J.S. told the 911 operator that he was "locked" in the victim's closet and could not get out. J.S. explained that the victim told him to go to his "safe spot." J.S. told the 911 operator that the Defendant wanted to take him to California and never bring him back. J.S. also told the 911 operator that the Defendant was "still outside." The 911 operator testified that J.S. "seemed upset," was "pretty nervous," and was "scared." The 911 operator recalled that there were "[a] couple of times it sounded like [J.S.] started to kind of break down."

Deputies Taylor Hayes, Walter Hurd, and William Laws of the Washington County Sheriff's Office were dispatched to the victim's home. Deputy Hayes was the

-6-

first to arrive at the victim's home. Deputy Hayes did not see anyone outside the home and no one responded when he knocked on the front door. Deputy Hayes knocked on the front door again when Deputy Hurd arrived. This time the deputies noticed what appeared to be a smear of blood on the siding by the door knob. The front door was locked and they were given permission by their superiors to kick it in.

Once inside the home, the deputies began to search the house. Deputy Hurd noticed a blue "surgical" glove with what appeared to be blood on it by the front door. A second glove was found on the kitchen floor with a spot of what appeared to be blood on it. In front of the victim's bedroom door, the deputies found a closet door, the same height as the bedroom door but half as wide, propped up against the bedroom door just beneath the door knob. A rope came over the top of the bedroom door and was tied "in a figure-eight pattern" around the door knob of the closet door. The end of the rope was tied to a water meter key, a large t-shaped metal tool. The rope was "[v]ery tight." There was mud on the carpet in front of the bedroom door. The deputies also saw splinters on the floor of the hallway from where the closet door had been ripped off the wall.

The bedroom door was locked. The deputies knocked on the door and "heard a moan . . . from the other side." Deputy Hurd moved the closet door a short distance so they could kick in the bedroom door. Deputy Hurd testified that he could not move the closet door very far because the rope was so tense. The deputies kicked in the bedroom door, but it only opened a few inches. They then pushed the door until it opened enough for one of them to get inside the bedroom. The deputies found the victim face down on her stomach "right behind" the bedroom door with "[t]he rope that had been coming over the [bedroom] door . . . actually tied around her neck." The rope was "tied like a slipknot-style knot" around the victim's neck and was tight. The victim was bound with zip ties around her ankles and wrists that were bound together with more zip ties in "a hogtie style." The victim was bound so tightly that her hands and feet almost touched.

The victim was lying face down and not hanging when the deputies found her. However, Deputy Hurd believed that the rope loosened when he moved the closet door and that there was a "[g]ood probability" that the victim had been hanging by the rope prior to that. Deputy Hayes cut the rope with a pocket knife. The victim began "yelling and moaning and asking where her child was." The victim was "very confused" and frightened. The victim thought she had been in a car accident and that J.S. was trapped in the backseat. Deputy Hayes attempted to cut the zip ties off of the victim's ankles and wrists, but some were on too tight for him to cut with a knife. Deputy Hurd found a nightstand in front of the bedroom closet door. He moved the night stand and found J.S. in the closet. Deputy Hurd gave J.S. to Deputy Laws who took J.S. outside. Outside, J.S. told Deputy Laws that the Defendant had come to get him, that he saw the Defendant on a camera, and that the victim told him to go to the bedroom closet.

-7-

The deputies found a kitchen knife on the bedroom floor near the victim. There was more mud on the bedroom floor. The victim's broken glasses were found on top of a filing cabinet near the bedroom door. The deputies also found a piece of the victim's scalp and a clump of her hair hanging from the corner of the top drawer. The top drawer of a second nightstand by the bed had been removed and the contents of the drawer had been gone through. The deputies found what appeared to be a blood smear on the back of the bedroom door. What appeared to be a second blood smear was found on the wall above where the victim's head had been. In the same area, "luis" had been written in what appeared to be blood. Later forensic testing revealed that the kitchen knife found in the victim's bedroom and the "surgical" gloves found in the house had the victim's blood on them.

Paramedics arrived to treat the victim. The victim was bleeding a "small amount" from a laceration on the back of her head. One of the zip ties was tied so tightly around the victim's wrist that the paramedic had to use a special "ring cutter" to remove it. The victim "looked like she'd been assaulted." The victim had a cut on the back of her head and a knot on her head. The victim had "abrasions around her wrists and ankles." There were also "some abrasions . . . and bruising around her neck." The victim had bruising and swelling on one of her ears and bruising around her left eye and temple. The victim also had bruising on her arms and back. The victim complained of pain to her neck, shoulders, back, and wrists. The victim was not oriented to time and could not remember anything that had happened that day or the day before. The victim was taken to an emergency room where she was diagnosed with a concussion due to her head injury and "amnesia and confusion." The emergency room doctor also noted that the victim had suffered scattered abrasions and bruising.

On December 28, 2015, the victim was interviewed by Investigator Clinton Arnett of the Washington County Sheriff's Office. Investigator Arnett testified that the victim could not remember anything about the attack. The victim began receiving phone calls from the Defendant while Investigator Arnett was interviewing her. Investigator Arnett instructed her not to answer the Defendant's phone calls. The Defendant began sending the victim text messages that said, "Call me. Are you ready?" The Defendant also sent the victim an email. J.S. was taken for a forensic interview. After the forensic interview, Investigator Arnett instructed the victim to call the Defendant. However, the Defendant did not answer. Investigator Arnett instructed the victim to text the Defendant and reply to his email. The Defendant did not respond to either the victim's text message or her email.

Investigator Arnett contacted the Tennessee Bureau of Investigation to get its assistance in locating the Defendant by accessing his cell phone location data. The Defendant last used his cell phone in Washington County at 2:47 p.m. on December 28,

2015. The Defendant's cell phone was next used in Nashville on the morning of December 29, 2015. The Defendant was then apprehended on the morning of December 30, 2015, in Memphis.

The Defendant's pickup truck was seized and searched. The Defendant stated that he had gotten the truck from a friend. The application for registration of the truck was dated December 28, 2015. Inside the truck, Investigator Arnett found a receipt from a Firestone in the Nashville area showing that the Defendant had the truck repaired at 8:09 a.m. on December 29, 2015. Investigator Arnett also found a pair of muddy boots. Investigator Arnett believed that the mud on the boots found in the Defendant's truck was the same color as the mud on the victim's carpet.

The victim testified consistently with her testimony at the Rule 404(b) hearing about her history with the Defendant and the May 2010, November 2010, and March 2011 incidents of domestic violence. The State also called Sergeant Light who testified consistently with his testimony at the Rule 404(b) hearing. The victim testified that she and the Defendant divorced in 2014. The victim had custody of J.S., and the Defendant had supervised visitation. The Defendant later moved back to California. While in California, the Defendant would call and talk to J.S. on a special phone used only for phone calls between the Defendant and J.S.

The victim testified that she and the Defendant had arranged for the Defendant to visit J.S. in December 2015. The victim recalled that the Defendant was to arrive in Washington County on December 25 and visit J.S on December 26 and 27. The victim testified that she did not remember anything about December 26 and 27. The victim explained that the last thing she remembered was driving home in the rain on Christmas.

The victim testified that nothing was missing from her home. However, the victim also testified that the drawer in her nightstand that had been pulled out and rifled through was where she used to keep J.S.'s passport and some jewelry that was "very special" to the Defendant. The victim testified that the Defendant knew that was where she kept those items, but she had moved them prior the Defendant's visit in December 2015.

Kimberly Bushore-Maki, a licensed therapist and expert in counseling, testified that she had reviewed the victim's medical records, reviewed records of two "cases of abuse," and met with the victim. According to Ms. Bushore-Maki, the victim had been diagnosed with major depression disorder and post-traumatic stress disorder. Ms. Bushore-Maki opined that the victim could not remember the events of December 26 and 27, 2015, because she suffered from dissociative amnesia. Ms. Bushore-Maki explained that dissociative amnesia would cause a person not to remember a traumatic event as "a way to protect themselves" from the trauma.

J.S. testified by closed circuit television from the trial court's chambers with the prosecutor and defense counsel in the room with him. J.S. testified that on the day of the attack, he was home and had watched a movie with the victim and the Defendant. The Defendant left the victim's home after the movie, but he came back. The victim told J.S. to go into her bedroom closet, she told him to come out, and then told him to go back into the closet. J.S. testified that when he went back in the closet the second time, he was there "a very long time." J.S. testified that the Defendant was trying "to get and take" him away, "all the way back to California."

J.S. testified that he had "to be very quiet" in the closet so the Defendant would not know where he was. J.S. called 911 because the Defendant was trying to take him away and he "needed help." J.S. testified that the Defendant and the victim were both in the home when he called 911. J.S. testified that the Defendant and the victim were making "medium sounds" and that the victim "was protecting [him]." J.S. recalled that he was scared that day. J.S. further testified that he saw the victim tied up when Deputy Hurd took him out of the closet.

After direct examination, J.S. asked for a drink. Defense counsel began his cross-examination and had asked two questions when the prosecutor interrupted him to give J.S. a drink. On cross-examination, J.S. testified that he knew the incident happened on a Sunday because the victim told him that the day the Defendant tried to take him was "a yucky Sunday." J.S. also admitted that the victim told him that the Defendant was going to take him and told him to go to the bedroom closet. J.S. testified that he could not remember the Defendant's name. At one point during the cross-examination, the prosecutor objected to a question, and J.S. asked what the word "objection" meant. The prosecutor briefly explained to J.S. what the word "objection" meant, and defense counsel continued with his cross-examination.

At the end of his cross-examination, defense counsel spoke to the Defendant using a headset. As defense counsel was speaking to the Defendant, J.S. said to the prosecutor, "I hope he doesn't chose to let [the Defendant] go. Because I don't think my answers are good." Defense counsel announced that he did not have any other questions for J.S. J.S. appeared to look at defense counsel and said, "I hope the judge doesn't choose to let [the Defendant] go. I don't think I said the right thing."[4] Defense counsel was aware of J.S.'s statement, and it was apparently broadcast to the jury because defense counsel referred to it during his closing argument to argue that J.S. had been "coached."

Based upon the foregoing, the jury convicted the Defendant of two counts of aggravated assault and three counts of aggravated kidnapping.

---

[4] A video recording and transcript of J.S.'s testimony were included in the appellate record.

## V. Sentencing Hearing

The trial court merged the convictions into one count each of aggravated assault and aggravated kidnapping. The trial court classified the Defendant as a Range I, standard offender. The trial court found that no mitigating factors applied to the Defendant's sentence. The trial court rejected the State's request that it find that the victim was particularly vulnerable and that the Defendant possessed a deadly weapon during the commission of the offense.

The trial court did find that the Defendant's prior convictions discussed at trial were "significant and establish[ed] a history to enhance the [Defendant's] sentence" because they were "very violent attacks" on the victim. The trial court found that the victim was treated with exceptional cruelty during the commission of the offenses and noted that the victim had been "tied up like livestock." The trial court also found that the Defendant had previously failed to comply with the conditions of his probation for his California convictions. Finally, the trial court found that the Defendant had no hesitation about committing a crime when the risk to human life was high because "he engineered and devised a scheme by which [the victim] would slowly suffocate or strangle."

Based upon those enhancement factors, the trial court sentenced the Defendant to the maximum six years for his aggravated assault conviction and the maximum twelve years for his aggravated kidnapping conviction. The trial court rejected the State's request that the sentences be served consecutively and ordered them to be served concurrently for a total effective sentence of twelve years.

## VI. Motion for New Trial Hearing

One of the grounds raised in the Defendant's Motion for New Trial was that the trial court erred "in suppressing a video image of the Defendant entering and exiting Ross's Department Store on December 27, 2015." Defense counsel introduced the video recording as an exhibit at the motion for new trial hearing. Defense counsel argued that the recording was necessary for the defense because it showed the Defendant's demeanor shortly after the offense had been committed. The recording showed the Defendant enter the store at 7:06 p.m. and then exit the store approximately thirty minutes later. The Defendant was only seen on the recording for a few seconds each time. The trial court denied the Defendant's Motion for New Trial on this ground and all others.

## ANALYSIS

## I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. The Defendant argues that the State failed to establish his identity as the perpetrator of the offenses. The Defendant argues that "[d]irect evidence of [his] guilt was completely lacking" and takes issue with the weight and value given by the jury to the circumstantial evidence of his guilt. Additionally, the Defendant argues that the victim's confinement was essentially incidental to the aggravated assault. The State responds that the evidence was sufficient to sustain the Defendant's convictions.

## A. Standard of Review

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As charged in the indictment, an aggravated assault occurs when the defendant intentionally or knowingly causes bodily injury to another by strangulation or attempted strangulation. Tenn. Code Ann. §§ 39-13-101, -102(a)(1)(A)(iv). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2). Strangulation is the intentional or knowing impediment of "normal breathing or circulation of the blood by applying pressure to the throat or neck or by blocking the nose and mouth of another person, regardless of whether that conduct results in any visible injury or whether the person has any intent to kill or protractedly injure the victim." Tenn. Code Ann. § 39-13-102(a)(2).

Alternatively, an aggravated assault occurs when the defendant intentionally or knowingly causes serious bodily injury to another. Tenn. Code Ann. §§ 39-13-101, -102(a)(1)(A)(i). "Serious bodily injury" is a bodily injury that involves either (1) a substantial risk of death; (2) protracted unconsciousness; (3) extreme physical pain; (4) protracted or obvious disfigurement; (5) protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (6) a broken bone of a child twelve years old or less. Tenn. Code Ann. § 39-11-106(a)(34).

As charged in the indictment, aggravated kidnapping occurs when a defendant "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty" and the removal or confinement is committed to "facilitate the commission of any felony or flight thereafter." Tenn. Code Ann. §§ 39-13-302, -304(a)(1). Alternatively, aggravated kidnapping occurs when the removal or confinement is done "[w]ith the intent to inflict serious bodily injury on or to terrorize the victim or another." Tenn. Code Ann. § 39-13-304(a)(3). Also, aggravated kidnapping occurs when "the victim suffers bodily injury" as a result of the removal or confinement.[5] Tenn. Code Ann. § 39-13-304(a)(4).

## B. Identity

The identity of the perpetrator "is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). However, the perpetrator's identity "may be established solely on the basis of circumstantial evidence." State v. Lewter, 313 S.W.3d

---

[5] While not raised by either of the parties, we note that the trial court improperly instructed the jury on this charge. The Defendant was indicted for committing an aggravated kidnapping when the victim suffered a bodily injury. However, the trial court instructed the jury that the aggravated kidnapping must have been committed "with the intent to inflict bodily injury on the alleged victim or another." Nevertheless, the trial court's incorrect jury instruction did not constitute plain error because the conviction was merged into the other aggravated kidnapping convictions. See State v. Minor, 546 S.W.3d 59, 67 (Tenn. 2018) (holding that consideration of the error must be necessary to do substantial justice for plain error review to be warranted).

-13-

745, 748 (Tenn. 2010). "It is well-established that the identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of competent proof." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

Here, there was significant evidence of the Defendant's identity as the perpetrator. The victim testified that the Defendant came to Washington County from California to visit J.S. J.S. testified that on the day of the attack, he was home and had watched a movie with the victim and the Defendant. The Defendant left but came back a short time later. The victim told J.S. to go into her closet because the Defendant was going to take him away. J.S. testified that he heard the victim and the Defendant making "medium sounds" and that the victim "was protecting [him]." Likewise, J.S. told the 911 operator that the Defendant was "still outside" and that the Defendant wanted to take him to California and never bring him back.

Inside the house, the responding deputies found "surgical" gloves with the victim's blood on them. The victim had been bound with zip ties and a rope tied around her neck. The victim was placed in front of the bedroom door. The bedroom door was locked and the rope was run over the top of it and tied to a water meter key and a closet door that had been ripped from its hinges and placed against the bedroom door. A piece of the victim's scalp and some of her hair were found hanging from the corner of a filing cabinet drawer near the victim. The Defendant's first name was written in what appeared to be blood on the wall facing the victim's head. A drawer on the victim's nightstand where the Defendant believed she kept J.S.'s passport and some jewelry that was "very special" to the Defendant had been pulled out and rifled through.

The Defendant repeatedly called and texted the victim the next day. The Defendant emailed the victim. However, when the victim called the Defendant back, he did not answer. The Defendant also did not respond to her text messages or email. Instead, the Defendant fled Washington County. The Defendant was eventually apprehended in Memphis on the morning of December 30, 2015. A pair of muddy boots was found inside the Defendant's pickup truck. Investigator Arnett believed that the mud on the boots was the same color as the mud on the victim's carpet. Additionally, there was a well-documented history of violence between the Defendant and the victim, including a similar incident when the Defendant barricaded the victim in a bathroom and set fire to a rug outside the door. Accordingly, we conclude that the evidence was sufficient to establish the Defendant's identity as the perpetrator of the offenses.

### C. Incidental Confinement

This state's kidnapping statutes "evince a legislative intent to punish as kidnapping only those instances in which the removal or confinement has criminal

-14-

significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." State v. White, 362 S.W.3d 559, 577 (Tenn. 2012). The Defendant argues that "choking by means of the rope [tied around the victim's neck] was the primary means upon which the aggravated assault conviction stood." The Defendant further argues that the aggravated kidnapping was essentially incidental to the aggravated assault because "the . . . rope was the only basis available for confinement to the bedroom." This is a gross mischaracterization of the facts. The victim was bound with zip ties around her ankles and wrists that were bound together with more zip ties in "a hogtie style." The victim was bound so tightly that her hands and feet almost touched. The victim's confinement had criminal significance above and beyond that necessary to consummate the aggravated assault by strangulation. Accordingly, we conclude that this issue is devoid of merit.

## II. Rule 404(b) Evidence

The Defendant contends that the trial erred in admitting evidence of three prior incidents of domestic violence involving him and the victim. The Defendant argues that the trial court's ruling should not be reviewed for an abuse of discretion because the trial court failed to substantially comply with the procedural requirements of Tennessee Rule of Evidence 404(b). The Defendant also argues that the trial court erred in finding that a material issue existed other than conduct conforming with a character trait and that the probative value of this evidence was outweighed by the danger of unfair prejudice. The Defendant further argues that the trial court erred in instructing the jury on material issues not raised by the facts of this case. The State responds that the trial court did not abuse its discretion in admitting the evidence.

## A. Standard of Review

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person's actions were in conformity with the character trait. Tenn. R. Evid. 404(b). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. State v. Tolliver, 117 S.W.3d 216, 230 (Tenn. 2003); State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). In addition to these exceptions, evidence of other acts may be admitted to provide the jury with necessary contextual background. State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000).

Rule 404(b) requires the court to hold a jury-out hearing regarding the admissibility of specific instances of conduct "upon request." Tenn. R. Evid. 404(b)(1). In order to determine the admissibility of another bad act, the trial court must consider the

-15-

following three elements: (1) whether a material issue other than conduct conforming with a character trait exists supporting admission of the other act; (2) whether proof of the other act is clear and convincing; and (3) whether the danger of unfair prejudice is outweighed by the probative value of the evidence. Tenn. R. Evid. 404(b)(2)-(4). The trial court's ruling on the admissibility of Rule 404(b) evidence is reviewed for an abuse of discretion if the trial court has substantially complied with the procedural requirements of Rule 404(b). State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

## B. Substantial Compliance with the Procedural Requirements

The Defendant argues that the trial court did not substantially comply with the procedural requirements of Rule 404(b) because it failed to "provide the analysis required to evaluate probative value versus [the danger of] prejudicial effect." The Defendant cites State v. Jones, 450 S.W.3d 866 (Tenn. 2014), to argue that the trial court failed to analyze the probative value versus the danger of unfair prejudice. However, the Defendant misapplies Jones. The court in Jones found that the trial court had substantially complied with the procedural requirements of Rule 404(b) and reviewed the trial court's ruling for an abuse of discretion. Id. at 892. Rather, the court in Jones held that the trial court had abused its discretion in finding that the probative value of the evidence outweighed the danger of unfair prejudice. Id. at 894-900.

Here, the trial court held a jury-out hearing where the State attempted to establish five prior incidents of domestic violence between the victim and the Defendant by presenting the testimony of the victim and Sergeant Light. The State also presented documentation and photographs for three of the incidents. After the hearing, the trial court issued a lengthy written order. The trial court found that two of the incidents had not been established by clear and convincing evidence. The trial court found that the remaining incidents had been sufficiently established. The trial court also found that "identity, motive, common scheme or plan[,] and intent [were] material issues present in this case." The trial court further found that these incidents were "probative of the [D]efendant's hostility toward the victim, malice, or a settled purpose to harm her." Specifically, the trial court stated that the evidence was "highly probative of the settled intent of the Defendant to harm the victim" and concluded that the probative value of the evidence outweighed the danger of unfair prejudice. Accordingly, we conclude that the trial court substantially complied with the procedural requirements of Rule 404(b), and we will review its decision for an abuse of discretion.

## C. Material Issues

There is no "per se rule allowing the admission of evidence of prior acts of physical abuse committed by a defendant against a victim." State v. Gilley, 173 S.W.3d 1, 7 (Tenn. 2005). However, such evidence is admissible under Rule 404(b) when it is

relevant to show "the defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993). Put another way, such evidence would be admissible to prove material issues like motive or intent.[6] Id. at 574; State v. Gilley, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008).

We agree with the trial court that the three prior incidents of domestic violence were highly probative of the Defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim. The Defendant's intent to intentionally or knowingly injure and confine the victim was a material issue that the State was required to prove at trial. Likewise, motive was a material issue at trial as it was circumstantial evidence of the Defendant's intent and his identity as the perpetrator. See Gilley, 173 S.W.3d at 7 (quoting Neil P. Cohen, et al., Tennessee Law of Evidence, § 4.04[9] (6th ed. 2011)) (stating that motive itself "is rarely an issue in a case" but is "often circumstantial proof of some other important matter, such as identity, intent, or lack of accident").

The Defendant's identity as the perpetrator was also a material issue at trial given the victim's dissociative amnesia and the Defendant's argument at trial and on appeal that the State had failed to establish identity. The prior incidents of domestic violence illustrated the Defendant's motive that provided circumstantial proof of his identity as the perpetrator. Additionally, the incidents were similar in that the first two incidents involved injuries to the victim's head and the third incident involved the Defendant's attempting to confine the victim by barricading her in a bathroom. See Cohen, Tennessee Law of Evidence, § 4.04[15] (stating that "identity may be proved circumstantially by introducing evidence of a common scheme or plan, motive, or of another crime committed by the defendant" and that "[o]rdinarily the two offenses must be quite similar").

The trial court also found that the prior incidents of domestic violence were probative of a common scheme or plan. However, evidence of a common scheme or plan is only admissible if it falls into one of the following three categories: "(1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes, (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." State v. Moore, 6 S.W.3d 235, 240 (Tenn. 1999). The evidence here does not fall into any of those categories. As such, the trial court erred in finding that common scheme or plan was a material issue. However, this

---

[6] The term "intent" for purposes of a Rule 404(b) analysis does not refer to the specific mental state of intentionally, but to whether the defendant had the requisite mental state for the charged offense. See State v. Margaret L. Holt, No. E2010-02128-CCA-R3-CD, 2012 WL 826523, at *11-12 (Tenn. Crim. App. Mar. 13, 2012) (holding that the State could introduce evidence of prior bad acts under Rule 404(b) to prove whether the defendant acted intentionally, knowingly, or recklessly).

error was harmless because the evidence was admissible for the other material issues discussed above.  State v. Johnson, 366 S.W.3d 150, 159 (Tenn. Crim. App. 2011).

The Defendant argues that the prior incidents of domestic violence were not relevant to provide a contextual background for the case.  See Gilliland, 22 S.W.3d at 272 (holding that such evidence is admissible under Rule 404(b) when "(1) the absence of the evidence would create a chronological or conceptual void in the [S]tate's case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice").  However, the trial court did not find that contextual background was a material issue and did not rely on it in admitting the evidence.  Therefore, we need not determine whether the prior incidents of domestic violence satisfied the requirements for admission as contextual background evidence under Rule 404(b).

The Defendant argues that the three prior incidents admitted by the trial court were not relevant to any of the above material issues because they occurred several years before the offenses in this case.  However, "remoteness affects only the weight, not the admissibility of the evidence."  State v. Kiser, 284 S.W.3d 227, 291 (Tenn. 2009) (quoting Smith, 868 S.W.2d at 575).  Additionally, the Defendant argues that even if a material issue existed, the probative value of the evidence was outweighed by the danger of unfair prejudice.  We conclude that the trial court did not err in finding that the probative value of the evidence outweighed the danger of unfair prejudice given the largely circumstantial nature of the proof and the fact that the evidence touched on several material and interlocking issues.  Accordingly, we conclude that the trial court did not abuse its discretion in admitting the evidence of prior domestic violence between the Defendant and the victim.

### D. Jury Instruction

The Defendant argues that the trial court erred in instructing the jury on material issues not raised by the facts of this case.  Prior to the victim's testimony at trial, the trial court informed the parties that it would give the pattern jury instruction on Rule 404(b) evidence.  The trial court then read as follows:

> If from the proof you find that the defendant has committed crimes other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial.
>
> This evidence may only be considered by you for the limited purpose of determining whether it provides:

(a) the complete story of the crime; that is, such evidence may be considered by you where the prior crimes and the present alleged crime are logically related or connected, or are part of the same transaction, so that proof of the other tends, or is necessary, to prove the one charged, or is necessary for a complete account thereof.

(b) the defendant's identity; that is, such evidence may be considered by you if it tends to establish the defendant's identity in the case on trial.

(c) a scheme or plan; that is, such evidence may be considered by you if it tends to establish that the defendant engaged in a common scheme or plan for the commission of two or more crimes so related to each other that proof of one tends to establish the other.

(d) motive; that is, such evidence may be considered by you if it tends to show a motive of the defendant for the commission of the offense presently charged.

(e) the defendant's intent; that is, such evidence may be considered by you if it tends to establish that the defendant actually intended to commit the crime with which he is presently charged.

(f) guilty knowledge; that is, such evidence may be considered by you where guilty knowledge is an essential element of the crime charged and evidence of the other offenses tends to establish that the defendant possessed this knowledge at the time of the commission of the crime presently charged.

Such evidence of other crimes, if considered by you for any purpose, must not be considered for any purpose other than that specifically stated.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.10 (22d ed. 2018). Defense counsel did not object to the Rule 404(b) instruction as read and requested that the trial court include the instruction in its written jury charge to be given to the jury at the conclusion of the trial. The Defendant also did not challenge the Rule 404(b) jury instruction in his motion for new trial.

-19-

A panel of this court has previously held that instructing the jury on material issues under Rule 404(b) when no factual basis existed in the evidence to support those issues was reversible error. State v. Dominique Greer, No. E2015-00922-CCA-R3-CD, 2017 WL 2233647, at *14-15 (Tenn. Crim. App. May 17, 2017). However, in that case the defendant raised the issue in his motion for new trial. Id. at *14. Here, the Defendant did not contemporaneously object to the instruction or raise it in his motion for new trial. See Tenn. R. App. P. 3(e) (providing "that in all cases tried by a jury, no issues presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for a new trial"); 36(a) (not requiring "relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). As such, the Defendant has waived plenary review, and we review this issue solely for plain error.

The doctrine of plain error applies when all five of the following factors have been established:

> (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

State v. Minor, 546 S.W.3d 59, 67 (Tenn. 2018). A defendant's failure to establish any of these criteria requires denial of relief under the plain error doctrine, and "an appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." Id. "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006).

Here, the Defendant has failed to show that consideration of the error is necessary to do substantial justice. Minor, 546 S.W.3d at 67. "To minimize the impact of other act evidence and to ensure the jury does not misuse it, the trial court should instruct the jury on the proper use of the evidence." Cohen, Tennessee Law of Evidence, § 4.04[8][i]. However, this court has previously held that failure to give any limiting instruction was not plain error "[g]iven the strength of the State's case." State v. Billy Dean Sizemore, No. M2013-01853-CCA-R3-CD, 2014 WL 5800747, at *8 (Tenn. Crim. App. Nov. 7, 2014). Similarly, we conclude that the trial court's inclusion in the jury instructions of material issues not raised by the facts of this case was not plain error in light of the significant evidence of the Defendant's guilt.

-20-

### III. Testimony by Closed Circuit Television

The Defendant contends that the trial court erred in allowing J.S. to testify by closed circuit television. The Defendant argues that the evidence at the pretrial hearing did not support the trial court's finding that the statutory requirements had been met for J.S. to testify by closed circuit television. The Defendant also argues that "problems" with the closed circuit television procedure at trial "prevented meaningful cross[-]examination." Specifically, the Defendant argues that interruptions by the prosecutor, J.S.'s "hyperactivity" and "insufficient audio equipment" preventing the Defendant from hearing J.S., and the fact that defense counsel "had to step away to speak with" the Defendant denied the Defendant his right to confront J.S. The State responds that the trial court did not err in allowing J.S. to testify by closed circuit television and that the Defendant was able to confront J.S.

Tennessee Code Annotated section 24-7-120 provides that a child thirteen years old or younger who witnessed an aggravated kidnapping may testify outside the courtroom by closed circuit television if the trial court finds that: "(1) The particular child involved would be traumatized; (2) The source of the trauma is not the courtroom generally, but the presence of the defendant; and (3) The emotional distress suffered by the child would be more than de minimis, such that the child could not reasonably communicate." Tenn. Code Ann. §§ 24-7-120(a)(1)-(3), (d), (e)(6).

Here, Ms. Holloway, a therapist who had treated J.S., testified that J.S. continued "to struggle with fear and anxiety" because of the attack on the victim. Ms. Holloway explained that J.S. would "physically" shutdown and could not "talk about things" when asked to discuss the incident. Ms. Holloway testified that J.S. had "really struggled" with the idea of testifying in court and that he had repeatedly told her that he was afraid of the Defendant and did not "want to see" him. Ms. Holloway opined that it "would be very distressing" for J.S. to testify in front of the Defendant and that he "would probably become very, very anxious and shut down." The victim likewise testified that J.S. told her that he did not want to testify because he was afraid the Defendant would take him. The victim believed that J.S. would be terrified of seeing the Defendant and that he would not be able to testify or would "say anything" to keep from angering the Defendant.

The trial court accredited Ms. Holloway's testimony that J.S. would "shut down" when scared or anxious and that J.S. "still exhibit[ed] fear and anxiety" of the Defendant. The trial court also accredited the victim's testimony that J.S. was afraid to testify. The trial court found that J.S. was "traumatized and would be traumatized in a courtroom setting" with the Defendant present. The trial court also found that the emotional distress to J.S. would be "substantial" and that J.S. "would likely not be able to testify" with the Defendant in the courtroom. Based upon the foregoing, we conclude that the trial court

-21-

did not err in finding that that the statutory prerequisites of section 24-7-120 had been met and in allowing J.S. to testify by closed circuit television.

As for the Defendant's remaining arguments, we note that defense counsel made no contemporaneous objections to any of the issues now raised on appeal. Therefore, the Defendant has waived plenary review of these issues. See Tenn. R. App. P. 36(a) (not requiring "relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Accordingly, we review these issues solely for plain error.

Plain error review of these issues is not warranted because the Defendant has failed to establish that consideration of them is necessary to do substantial justice. Minor, 546 S.W.3d at 67. Defense counsel's cross-examination of J.S. was fifteen pages long in the transcript. Defense counsel was able to get J.S. to admit that the victim told him that the Defendant was going to take him away and that the day was "a yucky Sunday." Defense counsel was also, in general, able to get more direct answers from J.S. than the prosecutor. While the trial court repeatedly told J.S. to speak into the camera during both direct and cross-examination, there was no proof in the record that the Defendant was unable to understand J.S.'s testimony or consult with defense counsel about it.

The Defendant also complains that defense counsel had to "step away to speak with" him and that this prevented defense counsel from hearing J.S.'s comment that his answers were not "good." However, J.S. repeated this comment after defense counsel had spoken to the Defendant, and J.S. appeared to look at defense counsel as he made the second comment. Defense counsel was clearly aware of the comment because he used it during his closing argument to argue that J.S. had been "coached." Given the trial court's "large discretion in the control of cross-examination" and the fact that defense counsel was able to extensively cross-examine J.S., we conclude that plain error review of these issues is not warranted. Gwin v. State, 523 S.W.2d 636, 638 (Tenn. Crim. App. 1975) (holding that "[t]here was no denial of the fundamental right of cross-examination" when the trial court interrupted defense counsel's extensive cross-examination of a witness).

## IV. Exclusion of Evidence

The Defendant contends that the trial court erred in excluding a video recording of his entering a department store on the evening of December 27, 2015. The Defendant argues that the trial court excluded the recording to "punish" the defense for a discovery violation. The Defendant further argues that the recording was critical to his defense to rebut the State's theory "of intoxicated violence," to rebut the State's flight argument, and to show the Defendant's demeanor after the attack. The State responds that the trial court did not err in excluding the recording.

The United States Constitution "guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)); see also Chambers v. Mississippi, 410 U.S. 284, 294 (1973). The Tennessee Supreme Court also has recognized that the right to present a defense is "a fundamental element of due process of law." State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000) (quoting Washington v. Texas, 388 U.S. 14, 19 (1967)).

While this right to present evidence is not absolute, "the erroneous exclusion of evidence that thwarts a criminal defendant's right to present a defense is constitutional error." State v. Bell, 512 S.W.3d 167, (Tenn. 2015). In determining whether the trial court's erroneous exclusion of evidence violated a defendant's constitutional right to present a defense, this court must consider: "(1) [w]hether the excluded proof is critical to the defense; (2) [w]hether it bears sufficient indicia of reliability; and (3) [w]hether the interest supporting exclusion of the proof is substantially important." State v. Flood, 219 S.W.3d 307, 316 (Tenn. 2007).

Here, there is no dispute about whether the video recording bears sufficient indicia of reliability. As for the interest supporting exclusion of the proof, evidence should not be excluded "merely to punish either the State or the defendant for the deliberate conduct of counsel in failing to comply with a discovery order." State v. Garland, 617 S.W.2d 176, 185 (Tenn. Crim. App. 1981). The trial court stated that it was excluding the video recording because the Defendant's original counsel failed to turn it over to the State and "it should have been turned over . . . a long time ago." As such, our decision turns on whether the video recording was critical to the defense.

The question of "whether excluded evidence is critical to a defense is a fact-specific inquiry." Flood, 219 S.W.3d at 317. Here, the video recording was not critical because it had little probative value and "the exclusion did not undermine any elements of [the Defendant's] defense." Id. at 316-17. J.S. called 911 at 5:39 p.m.. The video recording showed the Defendant entering a department store at 7:06 p.m. and leaving approximately thirty minutes later. As such, the recording did not establish an alibi for the Defendant.

The Defendant argues it would have shown that he did not bind the victim to facilitate his flight from the aggravated assault. However, the recording does not support this argument as it shows the Defendant away from the crime scene. The Defendant also argues that it would have rebutted the State's argument that he fled Washington County to avoid apprehension. However, it was undisputed that the Defendant did not leave Washington County until after the victim began returning his phone calls, text messages, and email on the day after the video was recorded. The Defendant then traveled across the State until he was arrested in Memphis.

-23-

The Defendant also argues that the recording would have rebutted the State's argument that he "was a drunken wife beater" and would have shown his demeanor after the attack. However, the Defendant was only seen on the recording for a few seconds as he entered and then exited the department store. Therefore, the recording had little probative value as to the Defendant's demeanor or whether he appeared to be "a drunken wife beater." Accordingly, we conclude that the Defendant's right to present a defense was not violated by the trial court's exclusion of the video recording.

## V. Sentence Length

The Defendant contends that the trial court abused its discretion by imposing the maximum sentence for each conviction. The Defendant argues that the trial court erred in finding that he treated the victim with exceptional cruelty during the commission of the offenses and that he had no hesitation about committing a crime when the risk to human life was high. The State responds that the trial court did not abuse its discretion by imposing the maximum sentence for each conviction.

Appellate courts are to review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." State v. Bise, 380 S.W3d 682, 709 (Tenn. 2012) (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] . . . have been properly addressed." Id. at 706. If this is true, this court may not disturb the sentence even if a different result were preferred. State v. Carter, 254 S.W.3d 335 (Tenn. 2008). Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute . . . ." Bise, 380 S.W.3d at 706. On appeal, the burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d).

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Sentences involving incarceration "should be based on the following considerations":

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(2). Trial courts should consider the "potential or lack of potential for the rehabilitation or treatment of the defendant" when "determining the sentence alternative or length of term to be imposed." Tenn. Code Ann. § 40-35-103(5).

Additionally, the trial court must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (h) the results of validated risk and needs assessment contained in the presentence report. Tenn. Code Ann. § 40-35-210(b). To facilitate appellate review, "it is critical that [a] trial court[] adhere[s] to the statutory requirement set forth in Tennessee Code Annotated section 40-35-210(e)" and articulates in the record its reasons for imposing the specific sentence. Bise, 380 S.W.3d at 705 n.41.

Here, the trial court sentenced the Defendant within the appropriate statutory range for each conviction and articulated on the record its reasons for imposing the sentences. The Defendant's contends that the trial court misapplied two enhancement factors. However, the trial court also found that the Defendant's prior convictions were "significant and establish[ed] a history to enhance . . . [his] sentence" because they were "very violent attacks" on the victim. Additionally, the trial court found that the Defendant had previously failed to comply with the conditions of his probation for his prior California convictions. Even if the trial court misapplied the challenged enhancement factors, the presence of the other two would have given the trial court the discretion to impose the maximum sentences. Accordingly, we conclude that the Defendant has failed to show that the trial court abused its discretion in setting the length of his sentences.

## VI. Cumulative Error

The Defendant contends that he is entitled to a new trial based upon cumulative error. The cumulative error doctrine applies to circumstances in which there have been

"multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). However, circumstances which would warrant reversal of a conviction under the cumulative error doctrine "remain rare" and require that there has "been more than one actual error committed in the trial proceedings." Id. at 76-77. Here, the proceedings below were lengthy. The appellate record contains nine volumes of pretrial hearings. The trial took place over three days producing over 900 pages of transcript and 121 exhibits. The Defendant has failed to demonstrate that the cumulative effect of any errors was so great as to require reversal in order to preserve his right to a fair trial, especially given the significant evidence of the Defendant's guilt and the length of the trial proceedings. Accordingly, we conclude that this issue is without merit.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE